[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
RULING ON PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION
I. INTRODUCTION
This is a matter involving the enforceability of a non-competition agreement between the plaintiff Aetna Retirement Services ("ARS") and the defendant, Mark Hug. Hug is the former Head of Sales for ARS. He began employment with The Equitable Life Assurance Society of the United States as Senior Vice President for Annuity Product and Services approximately four months after cigning a non-competition agreement with ARS. CT Page 6622 The agreement prohibits Hug from working for a direct and substantial competitor of ARS for a period of one year following the conclusion of his employment at ARS.
It is useful at the start to make clear what this case concerns. It involves the enforceability of a noncompetition agreement voluntarily entered into by a very high ranking executive of ARS, who together with approximately twenty-five other senior level managers of ARS, were offered considerable financial inducements to enter into the agreement and were advised that no sanctions would be imposed if they declined to agree to the non-competition provision.
This case does not involve consideration of noncompetition agreements that, as a result of a blanket corporate policy, are presented to middle level managers under the threat of job termination. Rather, it involves the question of whether the contract, as drafted, can be enforced to prohibit a dynamic and innovative rising star in the financial planning industry — described by all parties as a person of unimpeachable integrity — from leaving his key position as ARS Head of Sales in which he and his staff generated in 1996 $3.2 billion in sales — for the position of Senior Vice President of Annuity Products at the Equitable, which in 1996 had $2.5 billion in sales.
A. Procedural Background.
1. Aetna filed this action on April 10, 1997 to enjoin its former Head of Sales, Defendant Mark A. Hug ("Hug"), from continuing employment with Defendant-Intervenor The Equitable Life Assurance Society of the United States ("The Equitable") as Senior Vice President for Annuity Products and Service. Aetna seeks to enforce the terms of a one year noncompetition agreement Hug executed approximately four months before he voluntarily resigned from Aetna to accept a position with The Equitable.
2. On April 15, 1997, the Court granted Aetna's request for a Temporary Restraining Order. On April 18, 1997, based upon Hug's motion and Hug's representation that he performed no customer service function at Aetna, the Court modified the TRO to allow Hug to manage customer service for The Equitable subject to a prohibition against Hug's participation in or attendance at any meetings having any direct or indirect CT Page 6623 involvement with the sale of The Equitable's products.
3. On May 7 and 9, 1997, the Court conducted two days of hearings on Plaintiffs' request for a Temporary Injunction. At the outset of the hearing held on May 7, 1997, and over Aetna's objection, the Court granted The Equitable's motion to intervene.
B. Hug's Position at Aetna.
4. For the five years leading up to his resignation on March 17, 1997, Hug worked in various positions at Aetna with increasing levels of responsibility. On January 1, 1996, Aetna named Hug Head of Sales with responsibility for the sale of all Aetna products and services, including annuity, life insurance and pension products. Aetna's 1996 sales for all of these products under Hug's supervision totaled approximately $3.2 billion; $1.35 billion of which was generated from the sale of individual annuity products and $1.4 billion of which was from the sale of pension products. In his capacity as Head of Sales, Hug supervised more than 800 Aetna employees, including Aetna's career and independent agents.
5. Hug was a highly paid senior level executive. In 1996, Hug received compensation of $335,000, consisting of an annual base salary of $210,000, a bonus of $70,000 and his exercise of some $55,000 in stock options and other incentive compensation. In the first three months of 1997, Hug received approximately $362,000 in cash, stock and bonus compensation consisting of $53,000 in base salary payments, incentive bonus awards of an additional $244,000 and, several days before his resignation, $65,000 in taxable income from his exercise of Aetna stock options.
6. As Head of Sales Hug had access to, reviewed and acquired Aetna trade secrets, confidential information and proprietary information concerning products, customers, financial planning, product development, pricing, pricing models and assumptions, marketing strategies, distribution channels, vendors, outside fund sources and fee arrangements, organizational design and efficiencies, test market pilots, field compensation structure and other business and financial data and information.
7. In September 1995, Aetna selected Hug and approximately eleven other executives to redesign Aetna's entire CT Page 6624 marketing and sales strategy to target the sale of multiple financial planning products to supply the needs of individual customers. The Aetna Life Strategic Organization Project, or "ASOP" as it became known, examined Aetna's retirement services business, assessed its strengths and weaknesses in the context of the rapidly developing financial services industry, and planned a strategic organizational structure to position itself in that market and to compete with life insurance companies, mutual fund companies, full service broker dealers and other financial services companies.
8. Pursuant to the ASOP redesign plans, Hug redesigned Aetna's field service operations and the compensation system for Aetna's entire sales force in 1996-97. The ASOP committee also developed a five year business plan and designed functional descriptions for Aetna's business areas and cross-functional organizational processes. Hug, among other executives, was responsible for executing these functions and processes.
9. In addition to his membership on the ASOP committee, Hug participated in 1995 and 1996 as a member of Aetna's 12-member Product Strategy Group ("PSG"). Although Aetna and Hug disagree over the degree of influence the PSG had over "final approval" of product decisions, with Hug arguing that the PSG merely acted as a rubber stamp, the PSG reviewed and considered trade secret and other confidential information and data concerning the positioning of Aetna products, product development and strategies, product pricing, pricing models and market strategies.
10. In early 1997, Aetna formally appointed Hug to Aetna's 10-member Management Committee as a full participating member. Prior to his appointment, Hug had attended numerous Management Committee meetings at the committee's request, primarily when the committee reviewed, discussed and decided product or sales issues. The Management Committee consisted of the "business head" for each of Aetna's business functions, including Product, Business Strategy and Finance, Marketing, Information Technology, Sales and Service, and Investments. The Management Committee met weekly and its members made plans concerning each of their specific areas and issues requiring coordination and cooperation between functions.
C. The Retention Bonus Agreement.
CT Page 6625
11. Beginning in the Fall of 1996, Aetna identified approximately 25 key executives, Hug included, whose leadership, knowledge and experience Aetna believed was critical to the achievement of its 5-year plan and full implementation of the ASOP recommendations. These executives possessed intimate knowledge of the specific plans concerning Aetna's strategic objective to market a full range of financial planning products and services.
12. Aetna offered to these executives the opportunity to participate in an incentive program (the "Retention Bonus Program") in addition to the bonus programs in which they already participated. Under the Retention Bonus Program, participants could receive a "Retention Bonus" which would vest on October 1, 1997 and October 1, 1998. For Hug, the value of the retention bonus ranged from a minimum $78,375 up to a maximum $157,500 depending upon Aetna's financial performance during the two years of the program. In addition, in the event that Aetna terminated Hug for reasons other than "for cause," the Retention Bonus Program guaranteed Hug additional severance benefits worth at least $250,000.
13. Under the terms of an agreement formalizing the Retention Bonus Program (the "Retention Bonus Agreement"), Aetna legally obligated itself to pay the retention bonus and severance benefits so long as Hug (1) did not voluntarily resign prior to October 1, 1998 and for one year thereafter did not work for a direct and substantial competitor or (2) did not engage in conduct that would justify his "for cause" termination as defined in Aetna's Employee Benefits Handbook.
14. Hug and the other participating executives signed the Retention Bonus Agreement containing the following noncompetition clause and restrictive covenant:
 a. Noncompetition. During the Retention Bonus Period and for a period of one year
following your termination of employment other than due to a job elimination or other termination by the Company without cause, you shall not become associated,
whether as a principal, partner, employee, consultant or shareholder (other than as a holder of not in excess of 1% of the outstanding voting shares of any publicly CT Page 6626 traded company), with any entity that is actively engaged in any geographic area in any business which is in substantial and direct competition with the business or businesses of the Company for which you have provided substantial services during the two years prior to the termination of your employment or for which you have or have had substantial responsibilities during the two years prior to the termination of your employment, provided that nothing in this Paragraph 6(a) shall preclude you from performing services solely and exclusively for a division or subsidiary of such an entity that is engaged in a non-competitive business.
15. The Retention Bonus Agreement also contained nondisclosure, nonsolicitation and cooperation agreements. Participation in the Retention Bonus Program was entirely voluntary. No one forced Hug to sign the agreement by threat of job termination or by any other means.
16. Hug received the Retention Bonus Agreement in the form of a letter dated October 31, 1996. Hug reviewed the agreement for two weeks, consulted with an attorney regarding the terms, made no counter proposal, and signed and dated the Retention Bonus Agreement on November 13, 1996.
17. Approximately two months before signing the Retention Bonus Agreement, in September 1996, Hug had contacted an executive search firm to explore possible employment. Hug had also communicated with The Equitable sometime prior to November 4, 1996 when The Equitable sent him some information, and Hug scheduled an appointment to meet The Equitable's Chief Executive Officer William McCaffrey on November 18, 1996.
18. Aetna has stipulated to the Court in the course of this proceeding that it would agree to continue Hug's annual base salary of $210,000 for such portion of the one year period of Hug's noncompete obligation during which Hug was not compensated by The Equitable.
D. Hug's Resignation.
CT Page 6627
19. On March 10, 1997, less than four months after Hug signed the Retention Bonus Agreement, Hug advised Kearney that he was considering resigning his position as of Head of Sales at Aetna in order to take a break from the pressures of his career and to contemplate his future. At that time, Hug told Kearney that he had an offer of employment at a regional life insurance company, National Life of Vermont Insurance Company ("Vermont Life"). Kearney voiced no objection to Hug's possible employment with Vermont Life. Rather, Kearney asked Hug to stay on with Aetna, to give the matter further thought, and to discuss the issue with him again in one week.
20. One week later, on March 17, 1997, Kearney met with Hug again, at which time Hug formally submitted his resignation effective at the end of March. Hug also announced to Kearney for the first time that he had accepted a position at The Equitable. In contrast to his position concerning Vermont Life, Kearney immediately told Hug that h s employment with The Equitable would violate the noncompetition obligations contained in Hug's Retention Bonus Agreement.
E. Aetna's Business and Market Strategy.
21. In its 1996 Annual Report, Aetna Inc. describes the business of ARS as follows:
 [ARS] offers financial services and individual life insurance products. Financial services products include fixed and variable annuity contracts, investment advisory services and pension plan administrative services and are offered mainly to individuals, pension plans, small businesses, and employer-sponsored groups in the health care, government and education markets.
22. William McCaffrey, The Equitable's Chief Operating Officer, described the business of The Equitable as follows:
 [The] Equitable provides financial planning, life insurance, annuities and other needs-based products and services for individuals and organizations using insurance and other financial products. CT Page 6628
23. In its Strategic Plan, essentially a five year operating blueprint, Aetna sets forth its strategy to become a financial and retirement planning partner for individuals and their families by focusing on individual customers, whether contacted through their employer or individually (i.e, through existing Aetna agents or through financial planners acquired in a corporate acquisition).
24. Aetna bases its current long range strategy on the expectation that "[o]ver 20% of households will seek investment advice within the next 12 months," that people in retirement now have longer life expectancy, and that $11 trillion will be subject to intergenerational transfer during the next two decades.
25. Aetna, in 1996, changed its marketing strategy to "de-emphasize affluent customers and to focus on those customers who buy insurance related products in conjunction with financial planning counseling." These are the same categories of products and customers targeted by The Equitable.
26. Hug identified Aetna's "Aetna Plus" and The Equitable's "Equivest" as comparable "man-on-the-street" products. In a 1997 report summarizing 1996 "Sales By Product", an independent industry group known as the Variable Annuity Resources Data Service ("VARDS") ranked all of the variable annuity products sold within the insurance industry for 1996. The VARDS report lists Equivest as the sixth highest ranking, and Aetna Plus as the thirteenth highest ranking, variable annuity products sold in 1996. Equivest 1996 sales were approximately $2.5 billion, while Aetna Plus 1996 sales were approximately $1.35 billion.
F. The Equitable's Business and Market Strategy.
27. According to The Equitable, its "growth strategy" is to focus "on the rapidly expanding financial needs of a maturing population that are redefining the concept of financial security." It further defines the three key market needs as "financial planning, estate planning and longevity-risk planning." To meet these identified needs, The Equitable intends to convert its 7,200 member career agent force to financial planners and develop "needs based" products for them to "sell to individuals." The Equitable also plans to offer its products through complementary channels, including stockbrokers CT Page 6629 and [independent] financial planners, as well as [through] large money center banks.
28. The Equitable's strategy is to market "needs-based" financial products through financial planning distribution. That strategy focuses on variable products. The Equitable is a dominant player in both the variable annuity and variable life insurance markets and is, according to its president, one of the few carriers with a strong position in both life insurance and annuities.
G. Hug's Duties at Aetna and at The Equitable.
29. Pursuant to Hug's responsibilities at ARS, he had access to product pricing, customer market analysis, product development and other information. Hug had intimate knowledge of all ARS products and many of the product improvements that it plans to launch over the next year. Aetna had at least2-3 new products and 4-5 product enhancements on the drawing board as of the time of Hug's departure.
30. Daniel Kearney, President of ARS Aetna testified that at Aetna "the sales and the product area are almost interchangeable in terms of identifying how to develop a product and bring a product to the market place", and that product development was an ongoing process that involves a "fifty-fifty" contribution between the product and sales functions.
31. Hug's "Success Profile" at Aetna defines the expectation that Hug "actively participate in cross-functional processes (e.g., product design, customer feedback loop, etc.)" and that Hug have a "deep knowledge of ARS business strategies, products and programs . . .". Hug agreed that he did.
32. Hug testified that the cross-functional business design at Aetna required his communication with and "input to product development" and "input again from sales" into marketing Hug further "participated on cross functional teams" with others to "manage and design product." Hug further conceded that the reason for his appointment to Aetna's PSG was to execute the coordination or efforts between the sales area and the product design area. Hug agreed that "the product features, the price, the cost, the return, et cetera" were issues that the PSG regularly discussed. CT Page 6630
33. Hug had access to and knowledge of Aetna's most profitable accounts. As Head of Sales at Aetna, Hug knew the key ingredients and arrangements that resulted in many of these accounts generating larger profit margins.
34. Hug was also responsible at Aetna for redesigning the compensation system for Aetna's sales force. Sales force compensation design is an important aspect of product pricing.
35. Hug also had knowledge and input into the selection and elimination of outside funds, fund reimbursements and distribution fees, arrangements with and profitability of the funds selected, and the strategy Aetna employed with respect to which funds would be managed independently and which would be sub advisors and managed directly by Aetna.
36. Hug also had responsibility for selecting or eliminating distribution channels for the sale of Aetna product, and for managing cost effective and efficient sales support functions.
37. Hug acknowledged at the hearing that he had "deep knowledge of ARS business strategies", of the "profit and loss" associated with each of Aetna's distribution channels, and of his responsibility for managing the sale of all of Aetna's products and all of Aetna's distribution channels whether through career agents, independent agents, financial intermediaries, private brokers or direct sales. Hug admitted that he has "potentially confidential or proprietary information about [Aetna's] annuity products [such as] the underlying assumptions that are used for pricing such as mortality, expense and interest rate assumptions."
H. Hug's Equitable Duties.
38. The Equitable's organizational chart describes Hug as the "Senior Vice President for Annuity Products and Services." The Equitable's organizational chart further describes Hug as the "full P L [profit and loss] General Manager [who] will head the company's #1 largest profit center . . . producing $2.5 billion of total individual annuity premiums sold through The Equitable's own field force."
39. Hug and his colleagues at The Equitable variously CT Page 6631 described Hug's duties at the Equitable as follows:
 (a) "I have been given overall responsibility for annuity product development . . .".
 (b) "I oversee the activities of . . . the Vice President of Contracts, Requests for Proposals and Outside Funds."
 (c) "I have been given overall responsibility for . . . new business operations, customer service and regulatory filings . . . ."
 (d) "design and development of pension products including group and individual annuities."
40. Hug would also have direct responsibility for supervising vice presidents who, on behalf of The Equitable, develop requests for proposals ("RFP's") for potential or existing Equitable clientele, contracts for registration of Equitable products with regulatory authorities, and negotiating and installing arrangements to offer funds other than those managed by The Equitable.
41. At The Equitable there is a collaborative effort between the Vice President of Annuity Products and Services, on the one hand, and sales, on the other hand, in terms of developing product design. The Annuity Products depends upon input from sales and marketing representatives in determining product design and target markets.
I. Substantial and Direct Competition
42. Aetna and The Equitable are "substantial and direct competitors" for the sale of annuity, insurance, pension and financial planning products within the terms of Hug's Retention Bonus Agreement.
43. A reporting service acknowledged by Hug to be an industry leader, the Variable Annuity Resources Data Service ("VARDS"), publishes annual rankings of the top 25 companies for the sale of variable annuities. The 1996 year-end VARDS rankings list both Aetna (ninth) and The Equitable (sixth) among the top ten companies for the total sale of individual CT Page 6632 and group variable annuity product. Aetna's and The Equitable's 1996 sales of variable annuity products respectively total almost $2.4 billion and $2.9 billion. Of the approximately $2.9 billion in total 1996 variable annuity sales generated by The Equitable, approximately $2.5 billion — or over 80% — comes from the annuity area for which Hug is the "full Profit and Loss Manager."
44. The "man-on-the-street" annuity products marketed by Aetna ("Aetna Plus") and by The Equitable ("Equitable") directly compete with one another. In "Sales Product" standings for the year 1996, VARDS identifies EquiVest as the sixth ranked variable annuity, with 1996 sales volume of approximately $2.25 billion, and Aetna Plus with the thirteenth ranked 1996 sales volume at nearly $1.35 billion. These products, for which Hug has full design, management and profit and loss responsibility at The Equitable, are clearly in substantial and direct competition with one another.
45. Hug's responsibilities at Aetna were to develop products and sales for small and large case customers. These are the markets to which his efforts at The Equitable will likewise be directed. Moreover, Hug has "full profit and loss general management" responsibility for annuity product.
46. Significantly, both The Equitable and Aetna describe their financial planning transition, their target clientele, and their "man-on-the-street" variable annuities and other financial planning products in virtually identical terms. For example, the descriptions of the two companies offered by The Equitable's own executives present nearly mirror images:
[ARS] offers financial services [The] Equitable provides financial and individual life insurance planning, life insurance, products. Financial annuities and other services products include needs-based products and services fixed and variable annuity for individuals and organizations. contracts, investment advisory Using insurance services and pension plan and other financial products, administrative services and are the Equitable offers asset offered mainly to individuals, protection, management and pension plans, small businesses, accumulation strategies, retirement and employer-sponsored income distribution groups in the health care, management and estate planning. government and education markets. CT Page 6633
II. PROPOSED CONCLUSIONS OF LAW
 A. Temporary Injunction Standard.
1. To obtain a preliminary injunction, Plaintiffs must demonstrate (1) a substantial threat of immediate irreparable harm, or that their claims raise sufficiently serious questions on the merits to make them a fair ground for litigation; and (2) that greater harm will result to the Plaintiffs without the protection of injunctive relief than to Hug if the Court grants the requested injunctive relief. See Daniel V.Keane Agency v. Butterworth, Conn. Super. LEXIS 507, 1995 WL 933871 (Conn.Super. 1995) (Levin, J.); Branson UltrasonicsCorp. v. Stratman, 421 F. Sup. 909, 913 (D.Conn. 1996) (Chatigny, J.).
2. The noncompetition agreement to which Defendant assented is a valuable business asset, the breach of which will necessarily cause Plaintiffs irreparable harm. See TorringtonCreamery, Inc. v. Davenport, 126 Conn. 515, 521, 12 A.2d 780,783 (1940); Daniel Keane Agency, supra, 1995 WL 933871 at *9. Alternatively, Plaintiffs' claims raise serious questions on the merits to make them a fair ground for litigation.
3. "The purpose of a temporary injunction is to preserve the status quo until a final determination of the parties' rights after a hearing on the merits." Tricoastal Lanthanides,Inc. v. Chang, 1995 WL 559039 (Conn.Super. 1995).
4. Plaintiffs will suffer irreparable harm and have raised "sufficiently serious questions on the merits to make them a fair ground for litigation's Wesley Software DevelopmentCorp. v. Burdette, No. 3:96CV1988 (DSS) slip op. at pp. 13-14 (D.Conn. 1996).
 B. The Retention Bonus Agreement Provided Defendant with Adequate Consideration
5. Hug knowingly, voluntarily, and after consulting with counsel, agreed to the covenant not to compete contained in the Retention Bonus Agreement in exchange for the substantial consideration provided under that agreement. The Retention Bonus Agreement is both a "stay" agreement and a noncompetition agreement. It obligates Hug to remain an Aetna CT Page 6634 employee for two years in return for the substantial bonuses recited in the Agreement. It also obligates Hug to refrain from working for a direct and substantial competitor for a period of one year after the conclusion of his employment at ARS, in return for which Hug would be eligible for the bonus agreements. While it is true that Hug would receive these bonuses only if he both remained an ARS employee for two years and did not compete for one year thereafter, Aetna's promises are not rendered illusory simply because Hug chose to leave ARS prior to the two year period he agreed to. Van Dyck Printing Co. v.DiNicola, 43 Conn. Super. 191, 196 (Conn.Super.Ct. 1993) (covenant not to compete enforceable when enhanced commission rate given as consideration); Daniel Keane Agency,
995 Conn. Super., LEXIS 507 at 21, 1995 WL 93387, pp. 6-7 (adequate consideration supported noncompetition agreement "where employee was eligible to earn larger bonuses").
6. Hug received Aetna's promise to pay him for the Retention Bonus (worth between $78,375 and $157,500), plus he received severance protection worth up to an additional $250,000. Thus, the consideration conferred upon Hug far exceeds, for example, the several thousand dollars in severance and stock options held legally sufficient in the Wesley Software
and Daniel V. Keane decisions. Wesley Software DevelopmentCorp., supra, slip op. at 14; Daniel v. Keane, supra, 1995 WL 93397, pp. 1-2.
7. The fact that Defendant, by his free election, ended his employment with Plaintiffs before he actually received either of the bonus payments to which he would otherwise have been entitled does not make Plaintiffs' promises illusory.See Osborne v. Locke Steel Chain Co., 153 Conn. 527, 531,218 A.2d 526, 529 (1966) ("An exchange of promises is sufficient consideration to support a contract"). Had Defendant otherwise fulfilled his promises, Plaintiffs would have had a legal obligation to pay Defendant his Retention Bonus.
 C. Under Connecticut Law, Courts Will Enforce a Restrictive Covenant Not to Compete if Judged Reasonable in Light of the Following Five Factors:
(1) the length of time the restriction is in effect;
(2) the geographical area covered by the restriction; CT Page 6635
 (3) the degree of protection afforded to the interest of the party in whose favor the covenant is made;
 (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and
 (5) the potential for undue interference with the interest of the public.
 • One Year Is a Reasonable Period to Restrict Defendant's Employment with Plaintiff's Competitors.
8. The one year term of the noncompetition provision reasonably protects Plaintiffs' interests. Hug knows of products and enhancements to products that Plaintiffs intend to introduce to the marketplace; profit and loss considerations of those products; Aetna's product strategies and weaknesses, strengths and data relating to decisions whether or not to position products in any given geographic, demographic or other target market. Regulatory agencies take a minimum of at least six to eight months to approve new products or product enhancements. Thus, it would take a competitor approximately one year from the time Plaintiffs filed for permission to offer a new product or product enhancement until the competitor could either copy or respond in the marketplace to Plaintiffs' product or product enhancement. Cf. Torrington Creamery, Inc. v. Davenport,126 Conn. 515, 12 A.2d 780 (1940) (where the Supreme Court enforced a two-year prohibition against competition);Hart Nininger Campbell Assoc. v. Rogers, 16 Conn. App. 619
(1988) (enforcing a two year noncompetition agreement); GeneralIron Welding Co., supra, 171 Conn. at 140, (the Supreme Court upheld a five year restrictions).
 • Defendant's Agreement Reasonably Limits His Employment to The Areas Where Plaintiffs and Defendants Compete.
9. The geographic scope is reasonable in light of Plaintiffs' business throughout the United States. See RobertS. Weiss Assoc., Inc., supra, 208 Conn. at 531-32; WesleySoftware, Slip. Op. at 15 ("the geographic scope of the restriction is not overly broad in light of Wesley's business throughout the United States and parts of Canada."); see alsoBranson Ultrasonics Corp., supra. 921 F. Supp. At 912 (injunction CT Page 6636 issued where employee agreed not to work for any competitor, no matter where, for one year); Continental Group, Inc.,supra, 422 F. Supp. at 842 (specified scope encompassing Canada, the United States, Western Europe and Japan not overly broad where employer competed "in all of the areas designated in the covenant"); Business Intelligence Services, Inc. v. Hudson,580 F. Sup. 1068, (S.D.N.Y. 1984) (worldwide scope of noncompetition clause reasonable in light of international nature of employer's business).
 • Defendant's Agreement Reasonable Protects Plaintiffs' Competitive Advantage.
10. A covenant not to compete is reasonable "when the character of the business or the nature of the employment are such that the employer requires protection against competitive activities by one who has become familiar with it through employment therein [and such] restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights." General Iron WeldingCo., supra, 171 Conn. 132 (1976). See also Branson UltrasonicsCorp., supra, 921 F. Supp. at 913-19. "When, as here, a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential information will be disclosed either intentionally or inadvertently, by the employee in the course of his new employment, enforcement of a covenant not to compete is necessary to protect against such use and disclosure,";Gillette Company, supra, 360 F. Supp. at 1176-77. ("At the time the parties entered into the contract containing the restrictive covenants, it was reasonable to assume that a key employee, as Williams was, might be familiar with valuable information if he subsequently left Gillette's employment to work for a competitor); Continental Group, Inc., supra,422 F. Supp. at 844-45 (holding that "[t]he noncompetition covenant adds something to the protection to the employer beyond what he would expect from the normal incidents of the employer-employee relationship or from a secrecy agreement . . .).
11. Defendant argues that he has not yet misappropriated Plaintiffs' trade secrets and he has promised not to disclose them in the future. It is unquestionable that Hug is a person of umimpeachable integrity whose honesty is widely respected and admired. Nevertheless, Hug's decisions, contributions and strategic insights cannot help but be informed by CT Page 6637 the framework and knowledge he gained in his employment at Aetna in making and participating in strategic business, sales, product and marketing plans. See, e.g., Triangle Sheet Metal,supra, 154 Conn. at 122, 222 A.2d at 223; Gillette Company,supra, 360 F. Supp. at 1176-77 ("reasonable to assume Defendant might be familiar with valuable information . . . [which] it would be virtually impossible to avoid or detect his disclosing . . .".);PepsiCo, supra, 54 F.3d at 1272 (Defendant's knowledge of "pricing architecture . . . trade channels, package size and other characteristics of products and customers . . . would inevitably shape" activities at competitor firm); BransonUltrasonics, supra, 921 F. Supp. at 912-13 (finding one year covenant reasonable and enforceable based on finding that "[i]n the course of his new employment at Dukane, opportunities will arise for Stratman to use and disclose confidential information he gained while at Branson . . . [and] to detect any such use or disclosure would be nearly impossible . . .").
 • The Restrictions on Defendant Allow Him to Pursue his Livelihood.
12. Hug can work without violating the noncompetition agreement in a variety of positions in the financial services industry, including for Vermont Life, a company with whom Hug at least explored employment opportunities, and other companies that would not violate his agreement or otherwise threaten Aetna with the loss of its competitive advantages. The defendants argue that as drafted the non-competition agreement prohibits Hug from working at any company whatsoever that sells financial planning products and services. The testimony does not support defendants' broad reading of the agreement. Further, the court need not decide at this juncture whether the clause, on its face, would prohibit Hug from working at specific companies referred to by counsel. The only issue presently before the court is whether The Equitable is a direct and substantial competitor of ARS.
III. CONCLUSION
Based on the foregoing findings of fact and conclusions of law, the plaintiff's application for a temporary injunction is granted. Because it is impossible to guarantee that a full hearing and decision on the merits of the plaintiff's application for a permanent injunction will be rendered prior to the expiration of the one year noncompetition period CT Page 6638 set forth in the agreement of the parties, the court concludes that, subject to further proceedings in this case, it is reasonable and appropriate to enjoin the plaintiff, for a period of six months from the commencement of Hug's employment at The Equitable, from continuing employment with The Equitable Life Assurance Society of the United States. Webcraft Technologies,Inc. V. McCaw, 674 F. Sup. 1039 (S.D.N.Y. 1987); Wesley SoftwareDevelopment v. Wesley Burdette, et al, supra. In accordance with its representation in court, during the period the injunction is in effect Aetna will pay Hug the pro rata portion of his $210,000 Aetna base salary.
SO ORDERED
ROBERT L. HOLZBERG JUDGE, SUPERIOR COURT